UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SCOTT D. DEISENROTH,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 19-cv-00614-WHO

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENTAND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT; REMANDING FOR PAYMENT OF BENEFITS**

Re: Dkt. No. 18, 25, 26

   The parties have filed cross-motions for summary judgement in this Social Security appeal. Based upon my review of the parties' papers and the administrative record, I GRANT plaintiff Scott D. Deisenroth's motion, DENY the Commissioner's motion, and REMAND this case for a calculation and award of benefits.

## BACKGROUND

### I.     PROCEDURAL HISTORY

   Scott D. Deisenroth applied for Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act on December 23, 2015.  Administrative Record ("AR") 18.  He initially claimed an onset date of September 1, 2015, for sleep apnea, chronic fatigue, depression, and heart issues.  AR 104.  On December 18, 2017, he amended the onset date to October 4, 2015.  AR 104, 252.  His application was denied initially and upon reconsideration. AR 104, 113.

   Deisenroth requested a hearing and appeared before Administrative Law Judge ("ALJ") Betty R. Barbeito on November 29, 2017.  AR 38.  The ALJ issued an unfavorable decision on May 10, 2018.  AR 1.  ALJ Barbeito's decision became the Commissioner's final decision when the Appeals Counsel declined review on January 9, 2019.  AR 1-3.  Now pending before the Court

are Deisenroth's motion for summary judgement, filed June 13, 2019, and the Commissioner's

cross motion for summary judgement filed September 23, 2019.  [Dkt. Nos. 18, 25].

## II.     EDUCATION, WORK, AND MEDICAL HISTORY

Deisenroth earned a high school degree, attended some college, and has training as an

electrician.  AR 42, 177, 415.  He worked as a certified electrician until he was laid off in April

2015 and has been unemployed since.  AR 43.

### A.     Treatment Records and Self-Reports

#### 1.     Sleep Apnea Specialist

Deisenroth began seeing Dr. Alex A. Clerk, a sleep specialist, on February 18, 2002.  AR

311.  Dr. Clerk has board certifications in "Sleep Medicine" and in "Psychiatry & Neurology."

AR 313.  Deisenroth was referred to Dr. Clerk because he suffered from "loud disruptive snoring

and difficulty maintaining sleep."  *Id.*  During his first visit, Dr. Clerk conducted a sleep study on

Deisenroth and noted that he scored a seven out of 24 on the Epworth Sleepiness Scale, which is

considered "normal."  AR 313.  But, the combination of Deisenroth's other symptoms—

significant sleepiness, loud disruptive snoring, excessive caffeine consumption—indicated a

diagnosis of obstructive sleep apnea.  *Id.*  Dr. Clerk noted that Deisenroth was currently taking

Wellbutrin and concluded that he had obstructive sleep apnea, depression, and alcohol dependence

(in remission).  AR 313-14.  Dr. Clerk reviewed a "nocturnal polysomnogram" run on February

27, 2002 and determined the results were "consistent with Obstructive Sleep Apnea Syndrome."

AR 301.  He indicated that the treatment options available to Deisenroth were "weight loss, use of

dental devices, nasal CPAP [(continuous positive airway pressure)], and upper airway surgery."

AR 313.  Further, Dr. Clerk found the recommended CPAP for Deisenroth's treatment to be 14.0

cm of water.  *Id.*

Deisenroth visited Dr. Clerk every four to six months between 2002 and August 2017.  AR

429.  On March 27, 2009, Dr. Clerk issued a report for another nocturnal polysomnogram

conducted on March 25, 2009.  AR 291.  Based on the nocturnal polysomnogram, Dr. Clerk stated

Deisenroth's recording was still "consistent with Obstructive Sleep Apnea Syndrome."  *Id.*  To

treat the sleep apnea, he recommended that Deisenroth use "nasal CPAP at 13.0 cm" of water.  *Id.*

On November 4, 2014, Dr. Clerk observed Deisenroth had chronic sleep apnea and experienced "decreased energy" and physical fatigue. AR 268. Dr. Clerk noted Deisenroth "has continued on nasal CPAP for the year" to treat his sleep apnea. *Id.* Further, he identified Deisenroth's "recurrent major depression" and stated that Deisenroth "sometimes has [a] death wish." AR 268-269, 271. Clerk noted that Deisenroth had previously taken Wellbutrin and "would like to go back on it," and he directed Deisenroth to restart the Wellbutrin at a specific dosage. AR 268, 271. During a follow up visit on December 4, 2014, he reported that Deisenroth's sleep quality with the CPAP machine was "good," his sleep apnea was "controlled," he had "no significant side effects," and his compliance with treatment was "good." AR 337. He recommended that Deisenroth "[c]ontinue CPAP indefinitely" and noted Deisenroth's CPAP was set at 12.0 cm of water. AR 337, 339. Dr. Clerk noted that Deisenroth had a Wellbutrin prescription and was "encouraged to fill [it]." AR 338-39.

Dr. Clerk issued a final report for a "Nocturnal Polysomnogram performed for CPAP titration on [June 6, 2015]." AR 316. Based on the results, he recommended that Deisenroth continue to use "nasal CPAP at 14.0 cm of water." *Id.* In August 2015, Dr. Clerk noted that Deisenroth's sleep apnea was "controlled" and that he had "no significant side effects." AR 334. But, on the same date, Dr. Clerk recorded that Deisenroth scored a 13 out of 24 on the Epworth Sleepiness Scale. *Id.* Though his sleep apnea was "controlled," Dr. Clerk reported Deisenroth had poor sleep quality, poor sleep hygiene (was drinking four to five cups of coffee a day), and his sleep quality was poor with CPAP use (despite "excellent [treatment] compliance at 97%"). *Id.* In response to his poor sleep quality, Dr. Clerk issued a titration study "to confirm objective sleepiness despite effectiveness of CPAP." AR 336. Dr. Clerk noted Deisenroth's continued prescription for Wellbutrin. AR 335.

On April 12, 2016, Deisenroth scored a 17 out of 24 on the Epworth Sleepiness Scale, which correlates to "severe excess daytime sleepiness." AR 256, 448. His sleep quality with the CPAP machine was "good." He reported no daytime hypersomnolence and "no significant side effects" and continued using the CPAP at 14.0 cm of water. AR 448. However, he still had poor sleep hygiene and suffered from fatigue and insomnia. *Id.* Dr. Clerk concluded that Deisenroth

was still depressed and his mood was "uncontrolled." AR 449. Dr. Clerk noted that Deisenroth still had a prescription for Wellbutrin but was "currently off [it]." AR 449-50. Further, Deisenroth was satisfied with his therapy but Dr. Clerk opined he "still need[ed] mood stabilization," and prescribed Pristiq for Deisenroth's anxiety and depression. AR 449, 451.

On May 12, 2016, he still scored a 17 out of 24 on the Epworth Sleepiness Scale. AR 452. Dr. Clerk reported that Deisenroth was experiencing daytime hypersomnolence, poor sleep hygiene, and fatigue, but that his sleep apnea was controlled and his sleep quality with the CPAP machine was good. *Id.* Dr. Clerk stated Deisenroth's treatment compliance was "excellent." *Id.* Dr. Clerk commented that Deisenroth's mood was "stable and better and less irritable." AR 453. Deisenroth had prescriptions for Wellbutrin and Pristiq and Dr. Clerk stated that there was "good [medication] compliance." AR 453-54. He listed Deisenroth's diagnoses were still obstructive sleep apnea and major depression (in partial remission). AR 454.

On September 1, 2016, Dr. Clerk noted Deisenroth scored a 16 out of 24 on the Epworth Sleepiness Scale and reported his sleep quality was "[a]verage", but his sleep apnea was "significantly better" from his previous visit. AR 456. Dr. Clerk indicated Deisenroth was using CPAP set at 15.0 cm of water and "complying with nightly use with improvement in daytime function." *Id.* Deisenroth still experienced daytime hypersomnolence and had to "take[] daily naps." *Id.* Dr. Clerk reported that Deisenroth took himself off Pristiq, which he had been taking for depression. AR 458. Clerk prescribed Deisenroth Nuvigil to treat the sleep apnea along with use of the CPAP machine. *Id.*

Dr. Clerk signed a Physician's Medical Source Statement on August 18, 2017. AR 429. He listed that Deisenroth had obstructive sleep apnea and major depression, and that the prognosis was "poor because of unresolved depression." *Id.* He indicated Deisenroth's symptoms included: (i) decreased energy; (ii) problems interacting with the public; (iii) anxiety/panic attacks; and (iv) depression. AR 430. Dr. Clerk identified Deisenroth's respiratory disturbance index (14.5/hr.) and lowest oxygen saturation (89%) values from a polysomnographic study done for a sleep apnea evaluation. AR 429. He opined that Deisenroth experienced symptoms severe enough to interfere with his attention and concentration "frequently" during simple work tasks. AR 430. He

concluded that Deisenroth would be unable to perform tasks that are detailed or complicated, have strict deadlines, require close interactions with coworkers, are fast paced, or require exposure to work hazards. *Id.* Dr. Clerk did not comment on Deisenroth's functional limitations because they were "not applicable for sleep disorder & depression." *Id.*

### 2. Family Therapist

Deisenroth began seeing therapist Kit Chatsinchai M.A. MFT for depression on May 2, 2015. AR 426, 433. Deisenroth saw Chatsinchai on a monthly basis until at least 2017. AR 464-67. Chatsinchai reported that Deisenroth had severe alcohol use disorder, substance induced depression, other specified trauma and stress related disorder (depressive mood), and other problems related to employment (chronic unemployment, stress to heavy schedule, economic downturn). AR 464. The goal of Chatsinchai's treatment was to help "[i]dentify root causes of depression and development of learned behaviors including use of alcohol to deal with depression." *Id.*

In a summary dated June 6, 2016, Chatsinchai described Deisenroth's history of impairments (including unemployment precipitated by stress and "chronic struggling" with sleep apnea that has caused mental and physical fatigue) as well as Chatsinchai's objective clinical findings, the type of therapy provided over 46 visits, and diagnoses. AR 419-420.

Chatsinchai tried treating Deisenroth with Affect Management Training Skills to provide Deisenroth with "affect regulation skills" to reduce his "reliance on alcohol to cope with difficult emotions which include depression, shame (worthlessness), loneliness, and anger." AR 419. But, "[a]t the present time these skills have not been adequate for [Deisenroth] to manage the influx of these emotions and [he] still resorts to using alcohol to deal with these emotions." AR 420. He reported the long-term prognosis for Deisenroth's condition is uncertain. *Id.* Chatsinchai concluded that "[m]ental and physical fatigue due to sleep apnea and ingrained negative core beliefs contribute to cognitive distortions that feed into his constant depression and feeling of hopelessness." *Id.* In a letter sent to the Department of Social Services, dated August 27, 2016, Chatsinchai stated that the "challenge in treating [Deisenroth's] impairment is how sleep apnea, use of alcohol, depression (and non-responsive to its standard treatment for depression) appear to

mutually impact and worsen the condition of each (mutual negative feedback loop)." AR 426.

In a Physician's Medical Source Statement, dated August 20, 2017, Chatsinchai opined that Deisenroth suffered from depression, decreased energy, sleep disturbances, and had problems interacting with the public. AR 434. He, like Dr. Clerk, indicated that Deisenroth experienced symptoms severe enough to "frequently" interfere with his attention and concentration during simple work tasks. AR 430, 434. He remarked that Deisenroth would be unable to work in an environment that involved public contact, close interactions with coworkers/supervisors, or completing fast paced tasks. AR 434. Further, his "lack of sleep may pose [an] occupational hazard." *Id.* When asked about Deisenroth's functional limitations in the workplace, Chatsinchai wrote that the "question [was] beyond the scope of [his] practice." *Id.*

On November 2, 2017, Chatsinchai signed a report that contained notes from Deisenroth's monthly sessions in 2017. AR 464-65. In the report, Chatsinchai characterized Deisenroth's sleep apnea as becoming severe in 2007. AR 464. He recorded that he was treating Deisenroth with "[a]ugmented derivate of EMDR with memory reconsolidation." *Id.* Chatsinchai concluded Deisenroth "has complex[] and multi-layer[s] of traumatic and abusive experiences." AR 467. Chatsinchai concluded that as Deisenroth's sleep apnea/breathing condition worsened "during the past few years," Deisenroth's "sense of hopelessness and depression have increased intensely." *Id.* Further, Deisenroth reported to Chatsinchai "that [the] prescription of different antidepressants ha[s] been ineffective" in treating his underlying depression. *Id.* Chatsinchai concludes, "[t]he psychological treatment has been very slow [] and still produces little progress." *Id.*

### 3.    Self-Reports

At the ALJ hearing, on November 29, 2017, Deisenroth testified that before he was fired he had become more forgetful and fatigued "over the course of the past five years until [he] felt it wasn't safe … [he] wasn't able to do his job safely." AR 55. He testified he damaged a "brand new" piece of equipment at his last job due to his forgetfulness. AR 54-55. Deisenroth felt his foreman saw that his performance was "slowing" and was concerned that he could not perform the job anymore, which Deisenroth believes led to the company firing him in April 2015. AR 43, 55. Deisenroth felt that his fatigue caused "brain fog" and his forgetfulness, as well as an inability to

recover from physical exertion and mental stress. AR 55.

Deisenroth explained that though his CPAP machine helps him sleep and prevents "life threatening" situations, he still wakes up many times during the night and is not getting the "deep sleep, the REM sleep" he needs. AR 56, 58. Some days he cannot perform basic grooming tasks due to his fatigue. AR 56-57. Deisenroth testified that he "tried many types of antidepressants" but discontinued the ones that his doctor prescribed to him[1] because the medications were not helping him and were "making [him] feel worse." AR 65-66. He reported that his fatigue causes his attention and concentration to worsen and his memory is impacted by it. AR 70.

Deisenroth filled out a self-report for his appeal dated July 13, 2016. AR 227. He reported that his condition worsened since he first filed for benefits. AR 228. Specifically, his fatigue was more severe and he "fall[s] asleep sitting up." *Id.* He stated that the increased fatigue makes him unable to "preform daily normal life tasks most days" and he relies on his spouse for help with those activities. AR 232.

On February 18, 2016, Deisenroth's wife, Tracy Deisenroth, filled out a third-party function report describing the impact of her husband's condition on his regular activities. AR 182. She said Deisenroth's lack of a normal sleeping pattern impacts his daily life and energy levels. *Id.* She also reported that Deisenroth sometimes has a hard time dressing and bathing. AR 184. She indicated his condition causes him to have a hard time lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, concentrating, remembering, completing tasks, following instructions, and getting along with others. AR 187.

**B.      Examining and Consultative Opinions**

**1.      Consultative Examiner**

On April 16, 2016, Dr. Roger Wagner examined Deisenroth with respect to his physical impairments. He concluded Deisenroth had sleep apnea, hypertension, and foot pain. AR 410.

---

[1] Deisenroth does not indicate when he stopped taking his medications for depression, but Dr. Clerk's medical records indicate Deisenroth was still taking anti-depressants as of his May 12, 2016, appointment, AR 453, but by September 2016 Deisenroth had taken himself of the medication. AR 458. At the ALJ hearing, on November 29, 2017, he was still not taking them. AR 65-66.

Dr. Wagner observed that Deisenroth demonstrated good dexterity and flexibility and was "easily" able to walk. AR 411. He concluded Deisenroth had no limitations in his walking and standing capacity, sitting capacity, or maximum lifting and carrying capacity, and that there were no limitations on Deisenroth's ability to engage in "workplace environmental activities." AR 414.

Dr. Antoinette Acenas conducted a psychiatric evaluation of Deisenroth on May 12, 2016. AR 415. She determined that Deisenroth had a depressed mood. AR 416. However, she concluded that he was able to "tolerate the usual stress and pressures associated with day-to-day work activities." AR 416-17. She noted that Deisenroth had intact memory function, was friendly and cooperative, denied hallucinations or thoughts of self-harm, had intact concentration, and intact judgement. *Id.*

### 2. State Agency Consultants

In May 2016, Dr. A. Garcia assessed Deisenroth's medically determinable impairments and severity based on Deisenroth's treatment records. AR 88-89. Dr. Garcia listed that Deisenroth did not have a combination of impairments that is severe. AR 88. Dr. Garcia determined that the combination of his impairments do not "significantly limit physical or mental ability to do basic work activities." AR 89.

In August 2016, Dr. C. Friedman provided his opinion in a Disability Determination Explanation report "at the [r]econsideration level." AR 93. Dr. Friedman stated that Deisenroth's "condition does not result in significant limitations in [his] ability to perform basic work activities." AR 101. Dr. Friedman explained he determined this after considering "the medical records, [Deisenroth's] statements, and how [his] condition affects [his] ability to work." *Id.*

### 3. Examiner Opinions

The ALJ called Dr. George Bell to testify as a medical expert at the ALJ hearing on Deisenroth's potential limitations from his mental health impairments. AR 47. Based on his review of Deisenroth's records, Dr. Bell questioned whether the limitations Dr. Clerk opined Deisenroth had (specifically, the indication by Dr. Clerk that Deisenroth's symptoms would frequently impact his attention and concentration, which translates to one-third to two-thirds of a workday) were due to his sleep apnea. AR 48. But from a psychiatric "point of view," Bell

opined that Deisenroth was only "markedly" impaired with respect to the B-3 criteria, "concentration, persistence, and pace." *Id.* Dr. Bell rated Deisenroth as mildly impaired for B-1, "understanding, remembering or applying information," B-2, "interacting with others," and for B-4, "adapting or managing one's self." AR 49.

Regarding work limitations, Dr. Bell concluded that Deisenroth could do "simple work with no contact with the public and with no strong quotas or time restrictions." AR 50. The ALJ also called Dr. J. Gaeta to testify as to potential limitations from Deisenroth's physical impairments, based on his review of Deisenroth's records. AR 26, 51. Dr. Gaeta opined that Deisenroth's history of alcoholism and BMI did not appear to impact him. AR 52. Dr. Gaeta concluded that sleep apnea is Deisenroth's main impairment, and it "is pretty well under control." *Id.* After assessing his conditions, Dr. Gaeta concluded that Deisenroth did not meet any of the medical listings and could lift "50 pounds occasionally and 20 pounds frequently" but should avoid heights and commercial driving. AR 53.

### 4.     Vocational Expert Opinion

Avi Sala testified as a vocational expert ("VE") at the ALJ hearing. AR 74. The ALJ asked her to consider a hypothetical individual that has: (i) sleep apnea; (ii) the physical limitation of "lift[ing] 50 pounds occasionally and 20 pounds frequently;" and (iii) the mental limitations of needing to work in an environment where they could avoid contact with the public, did not have time restraints, and did not have to complete high volume tasks. AR 76. She identified three jobs that would be appropriate for such an individual: (i) linen room attendant; (ii) cleaner industrial; and (iii) kitchen helper. AR 77-78. However, in response to a question from Deisenroth's attorney, Sala testified there would not be work for a hypothetical individual if they were off task for about "20 percent of an eight hour day, or 40 hour work week." AR 78.

## III.    ALJ DECISION

The ALJ utilized the five-step sequential evaluation to assess Deisenroth's disability claim. AR 19-29; *see* 20 C.F.R. §§ 404.1520(a), 416.920(b). At step one the ALJ determined that the claimant had not engaged in substantial gainful activity since October 4, 2015. AR 20. At step two the ALJ found that the claimant had the following severe impairments "in combination if not

singly": (i) obtrusive sleep apnea; (ii) obesity; and (iii) an affective disorder (depression). AR 20-21. The ALJ concluded that Deisenroth's diffuse myalgia was not severe because he conceded that "he could easily walk a mile and up to three or four miles." AR 21 (internal citations omitted).

At step three the ALJ concluded that Deisenroth's impairments did not meet or equal the severity required for any of the listed impairments. *Id.* The ALJ concluded that the combination of Deisenroth's obesity and obstructive sleep apnea "supports limiting the claimant to medium work." AR 22. The ALJ also found that Deisenroth's mental impairments do not meet or equal a listing under the "paragraph B" criteria. AR 22. The ALJ concluded that Deisenroth had only mild limitations in understanding, remembering, or applying information, based on his intact memory testing and self-reports of doing crossword puzzles, sudoku, and reading books. AR 22. The ALJ relied on Deisenroth's ability to socialize with friends and conduct daily tasks like shopping and maintaining a bank account, to determine that he had only mild limitations in interacting with others. AR 23. As to his ability to concentrate, persist in task performance, and maintain pace, the ALJ found moderate limitations because although "not impaired when formally tested," Dr. Clerk's notes indicate the sleep apnea impairs Deisenroth's concentration. *Id.* As to adapting and managing oneself, the ALJ found only mild limitations given Deisenroth's ability to perform a range of daily life activities. *Id.* Despite self-reports of difficulty with basic hygiene and self-care, the ALJ found this was not "consistent" with reports that he could do these activities and that he was repeatedly noted to be "well-groomed" during examinations. *Id.* Therefore, the ALJ concluded that Deisenroth had some mild and moderate mental limitations but these impairments did not cause "two marked limitations or one extreme limitation." *Id.* (internal citations omitted). The "paragraph C" criteria were not met because the record did not document a two-year history of a mental disorder or on-going treatments. *Id.*

Next, the ALJ determined Deisenroth's residual functional capacity ("RFC") allowed him to "perform medium work as defined in 20 CFR 404.1567(c) except that [Deisenroth] is limited to lifting and carrying 50 pounds occasionally and 20 pounds frequently." AR 24. In reaching this determination, the ALJ found that Deisenroth's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms" were not consistent with the other evidence in the record.  AR 25.

### A.    Evidence of Physical Impairments

In determining Deisenroth's RFC, the ALJ gave some weight to the limitations proposed by the consultative examiner, Dr. Wagner, who concluded Deisenroth had no physical limitations. The ALJ only assigned "some weight" because Wagner did not consider Deisenroth's obesity or the "residual effects of sleep apnea."  AR 25.

The ALJ gave great weight to the opinion of the non-examining medical expert, Dr. Gaeta, who testified at the hearing.  AR 26.  The ALJ found Dr. Gaeta's opinions that Deisenroth could perform work with "a medium level of exertional demand" and could lift "20 pounds occasionally, and should not work around heights or drive a commercial vehicle," were consistent with the other evidence in the record.  *Id.*

Regarding Deisenroth's sleep apnea, the ALJ concluded that it did not impair his ability to work.  AR 24.  She noted that his sleep apnea was diagnosed "for years prior to the alleged onset date" and even when it became severe in 2007, he continued to work for several years.  *Id.*  The ALJ concluded that this "supports an inference that, without documentation of an increase in severity, the claimant can work with the impairment."  *Id.*  The ALJ also relied on several years of Dr. Clerk's treatment notes from 2014 through 2016.  *Id.*  Based on those notes, the ALJ found with use of the CPAP machine, Deisenroth's sleep was improved and his sleep apnea "controlled." AR 25 (stating in May 2016 "claimant's sleep apnea was controlled" and his sleep quality was "good" and in September 2016 his sleep apnea was "'significantly better'… with good control of residual sleepiness during the day").  The ALJ also noted that Deisenroth "still experienced daytime sleepiness" but focused more on the control of his sleep apnea over the impact of it on his daytime symptoms.  *Id.*

Regarding the effects of sleep apnea on Deisenroth's ability to work, in August 2017 Dr. Clerk indicated Deisenroth "would be frequently distracted by symptoms, was unable to perform detailed or complicated tasks, fast-paced tasks, task requiring close interactions with supervisors

or co-workers, tasks with strict deadlines, or tasks involving exposure to workplace hazards." AR 25. The ALJ gave little weight to this opinion, because though "the doctor has a long treating relationship with the claimant, he is not a psychiatrist and points to no objective support for his suggested limitations." AR 25-26.

**B.    Evidence of Mental Impairments**

The ALJ did not find Deisenroth's depression to be significantly limiting. The ALJ noted that Deisenroth admitted to not taking his antidepressant medications because "he felt mentally altered when taking [them]." AR 24. The ALJ noted that despite being diagnosed with depression Deisenroth was able to continue working for years, had no history of psychiatric hospitalizations, and participates in therapy. AR 25. Though Deisenroth exhibited a depressed mood in May 2016, he had "intact memory function, was friendly and cooperative, denied hallucinations or thoughts of self-harm, had intact concentration, and intact judgement." *Id.* The ALJ discounted Chatsinchai's treatment notes for Deisenroth's depression because they "do not provide great insight into work-related function" and that while more recent records indicate claimant's problem with alcohol, that "diagnosis was not made by an acceptable source." *Id.* (discounting Chatsinchai's opinion because he is only an MFT). More broadly, the ALJ gave little weight to Chatsinchai's opinions as to Deisenroth's limitations because an MFT was not an "acceptable source" so he could not give an "opinion or make a diagnosis," and his treatment records can only be used to show "the severity of the claimant's impairments and how they affect the individual's ability to function." AR 25-26. The ALJ discounted Chatsinchai's view of Deisenroth's limitations from his depression solely because his opinions were "not consistent" with Dr. Wagner or Dr. Acenas, or the state agency consultants. AR 26.

Instead, the ALJ gave "some weight" to the opinion of examining consultant Dr. Acenas, who determined Deisenroth had "no impairment to any area of mental function." AR 25. The ALJ slightly discounted that opinion because Dr. Acenas did not consider the "residual effects of sleep apnea, specifically, drowsiness," on mental functioning. *Id.*

As to the opinion of Deisenroth's sleep specialist, Dr. Clerk, as noted above, the ALJ gave it little weight because he was "not a psychiatrist and point[ed] to no objective support for his

suggested limitations" and his assessment was inconsistent with the opinions of the examiners and stage agency consultants.  AR 25-26.

The ALJ gave "considerable" weight to the opinion of the impartial medical expert, Dr. Bell, who testified at the hearing.  AR 26.  Dr. Bell noted that Deisenroth "did not meet the criteria of any listings, and should be limited to simple tasks, with no public contacts, and no quotas."  *Id.*  The ALJ was skeptical of Dr. Bell's assessment that Deisenroth could not work with the public because she thought there was little support for this assertion in the record beyond Chatsinchai's report.  *Id.*

The ALJ also considered and gave "some weight" to the opinion of the state agency medical consultants, Dr. Garcia and Dr. Friedman, who reviewed Deisenroth's file in 2016, but did not actually examine him.  AR 26.  Dr. Garcia opined that Deisenroth did not have a severe impairment from any cause, and Dr. Friedman affirmed this opinion.  AR 27.  However, the ALJ noted that these opinions did not "thoroughly discuss the claimant's sleep apnea or the effects of that condition."  *Id.*  The ALJ found that "later records, from 2016," showed "significant improvement" in the control of Deisenroth's sleep apnea, but the "records available to the state agency consultants support[ed] a finding" that the sleep apnea was severe.  *Id.*

## C.    Self and Third-Party Reports

The ALJ considered Deisenroth's wife's third-party function report, but "generally gives less weight to the lay opinions of friends and family who may, reasonably, wish to avoid giving offense to the claimant by providing an opinion that differs materially from the facts as alleged in the claimant's own reports."  *Id.*  The ALJ found, in the present case, the described limitations "were not consistent with the more qualified opinions" of the consultative examiner and both medical experts.  *Id.*  Finally, the ALJ concluded that "support for" Deisenroth's own assertions of impairment were weakened "by the extent to which his assertions . . . are inconsistent with the other evidence in the record."  *Id.*

At step four, the ALJ found Deisenroth could not perform his past work.  At step five the ALJ found that Deisenroth was not disabled pursuant to the Medical-Vocational guidelines, relying on testimony from the VE who stated that an individual who was restricted only to not

working at heights, no commercial driving, with the ability to lift 50 pounds occasionally and 20 pounds frequently, could work as a linen room attendant, cleaner, or kitchen helper.  AR 27-29.

## LEGAL STANDARD

### I.    DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if they are (1) "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012).  To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment.  *Id.* § 416.920(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order to be considered severe.  *Id.* § 416.909.  In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations.  *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five.  *Id.* § 416.920(e).  In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past.  *Id.* § 416.920(a)(4)(iv).  The claimant bears the burden to prove steps one through four, as "[at] all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits."  *Id.* (alterations in original).  Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the

national economy that the claimant can do.  *Id.* §§ 416.920(a)(4)(v),(g); 416.960(c).

## II.  STANDARD OF REVIEW

Under 42 U.S.C. §405(g), the court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991) (ALJ's disability determination must be supported by substantial evidence and based on the proper legal standards).  Substantial evidence means "'more than a mere scintilla,' but less than a preponderance."  *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

The court must review the record as a whole and consider adverse as well as supporting evidence.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'"  *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

## DISCUSSION

Deisenroth argues that the ALJ (i) improperly rejected the opinions of Clerk, Chatsinchai, and Bell; (ii) improperly rejected Deisenroth's testimony; (iii) improperly rejected his wife's lay witness testimony; and (iv) given the ALJ's improper rejection of those opinions and testimonies, the ALJ's finding at step five was not supported by substantial evidence.  *See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgement ("Mot.") [Dkt. No. 18] 2.  The Commissioner opposes and moves for summary judgement, arguing that the ALJ's decision was adequately supported by the medical and non-medical evidence in the record.  *See* Defendant's Notice, Motion, and Memorandum in Support of Cross-Motion for Summary Judgement and in Opposition to Plaintiff's Motion for Summary Judgement ("Cross-Mot.") [Dkt.

No. 25] 2.

## I.     TREATING SOURCE OPINIONS

Deisenroth argues the ALJ improperly assigned little weight to opinions of his treating sources, his sleep apnea specialist Dr. Clerk and his therapist Kit Chatsinchai.  Mot. 9-10.  The Commissioner contends that the ALJ's findings are supported by substantial evidence and that proper weight and evaluation were given to the opinions of those sources.  Cross-Mot. 2-5.

### A.     DR. CLERK

The Ninth Circuit distinguishes between three types of physicians that provide information about a claimant: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, the opinion of a treating physician is entitled to greater weight than the opinion of a non-treating physician.  *Id.*; 20 C.F.R. § 404.1527(d)(2).  However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (citation omitted).  In order to properly reject the opinion of a treating or examining doctor when it is uncontradicted by another doctor, the ALJ must state "clear and convincing reasons" for doing so. *Lester*, 81 F.3d at 830.  If the treating or examining physician's opinion is contradicted by another physician, however, an ALJ may reject the treating or examining physician's opinion if she states "specific and legitimate reasons" that are supported by substantial evidence.  *Id.* at 830-31.

Deisenroth argues that the ALJ erred by giving "little weight" to Dr. Clerk's opinion concerning the impact of both his depression and sleep apnea on his ability to work.  Mot. 9.  He contends, first, that the ALJ improperly discounted Dr. Clerk's opinions on the impact of mental impairments on his functioning based on the incorrect assumption that Dr. Clerk was not a psychiatrist.  *Id.*  As demonstrated by the record, and admitted by the Commissioner, Dr. Clerk is a sleep specialist and board-certified psychiatrist who treated Deisenroth every four to six months since 2002.  AR 313 (listing Dr. Clerk's board certifications in "Sleep Medicine" and "Psychiatry & Neurology"); *see also* 268, 337, 448, 452, 458 (treatment records from 2002 to 2016).  As a

16

1  treating physician, his opinion is entitled to greater weight than the opinions of non-treating and

2  non-examining physicians.  *See Lester v. Chater*, 81 F.3d 821, 831 (1995).

3        I agree that the ALJ failed to provide specific and legitimate reasons supported by

4  substantial evidence, much less clear and convincing evidence, for rejecting Dr. Clerk's opinions

5  on the limitations Deisenroth's long-term sleep condition and major depression created on his

6  ability to function.  The ALJ improperly ignored that Dr. Clerk was a psychiatrist who consistently

7  diagnosed Deisenroth with major depression *and* prescribed medications for that depression.  It

8  was error to give reduced weight to Clerk's opinions about Deisenroth's limitations stemming

9  from the combined effects of his depression and long-term sleep condition.

10        The Commissioner concedes that the ALJ erred in failing to recognize Dr. Clerk was a

11  psychiatrist, but argues it was a harmless error because the ALJ also rested on the "more

12  important" reason that Clerk's opinion lacked objective support.  AR 26 ("points to no objective

13  support").   However, the records reflect that Dr. Clerk conducted numerous sleep studies on

14  Deisenroth and repeatedly assessed him on the Epworth Sleepiness Scale.  *See* AR 291, 301, 361

15  (discussing results from nocturnal polysomnogram he ran on Deisenroth in February 2002, March

16  2009, and June 2016); AR 334, 448, 452, 456 (listing his scores on the Epworth Sleepiness Scale:

17  13 out of 24 in August 2014, 17 out of 24 in April 2016 and May 2016, and 16 out of 24 in

18  September 2016).  These objective tests, and Clerk's contemporaneous notes, show that while the

19  sleep apnea might have been under "control" with the CPAP machine, adjustments were

20  repeatedly made to the CPAP equipment/levels throughout the treating relationship.  AR 268, 291,

21  313, 316, 336, 336, 448, 452 (showing Dr. Clerk adjusted the CPAP in February 2002, March

22  2009, November 2014, December 2014, June 2015, August 2015, April 2016, and May 2016).

23  Even more significantly, Deisenroth's sleep quality was consistently "poor," he was still waking

24  repeatedly in the night, and he still suffered from excessive sleepiness during the day.[2]  AR 452,

25  _____

26  [2] The ALJ purported to cite evidence showing Deisenroth's sleep improving, and his sleep was
   good.  AR 24-25.  However, while the sleep apnea might have been under "control" (preventing

27  any critical situations), the ALJ ignored other notes by Dr. Clerk, from the same visits, that
   showed that despite his sleep apnea being "controlled" through his regular use of the CPAP

28  machine, Deisenroth still suffered from poor sleep quality, poor sleep hygiene, and daytime
   sleepiness.  AR 334, 448, 449 (noting Deisenroth had "good [treatment] compliance" but still had

456 (In May 2016 Deisenroth reported daytime hypersomnolence despite his sleep apnea being "controlled," and in September 2016 he still experienced daytime hypersomnolence and took daily naps despite his sleep apnea being "significantly better" from his previous visit.).

In addition, Dr. Clerk regularly took note of Deisenroth's mental health status during his frequent visits and continuously diagnosed Deisenroth with major depression. AR 449-50, 453-54, 457. Over those years Dr. Clerk also noted that Deisenroth took Wellbutrin and in April 2016 prescribed him Pristiq for the depression. AR 451. Though, as of September 1, 2016, Deisenroth took himself off Pristiq, this evidence shows that Dr. Clerk was likewise noting and treating Deisenroth's depression based on his ongoing diagnosis.[3] AR 449 (noting on April 12, 2016 Deisenroth was off of Wellbutrin); AR 453-54 (noting on June 12, 2016 Deisenroth had good medicine compliance and was prescribed Wellbutrin and Pristiq); AR 457 (noting on September 1, 2016, "[Deisenroth] has taken himself off Pristi[q]").

Dr. Clerk's opinions as to Deisenroth's limitations from his mental health impairments and his sleep disorder were not discounted for specific and legitimate reasons supported by substantial evidence, much less "clear and convincing" reasons. *Lester*, 81 F.3d at 830.

Deisenroth also argues that the ALJ erred by concluding that Dr. Clerk's opinions were contradicted by the opinions of the examining physicians, Dr. Wagner and Dr. Acenas. Deisenroth asserts that Wagner and Acenas did not actually contradict Dr. Clerk's diagnoses or his conclusions about the impact those conditions had on Deisenroth, but instead found that Deisenroth had fewer restrictions than Dr. Clerk did. Mot. 10. I need not reach this argument because even under the more deferential "specific and legitimate reasons supported by substantial

_____

adverse symptoms).

[3] The record is not clear whether Dr. Clerk prescribed Deisenroth's Wellbutrin, or whether he simply noted the existence of a prescription for it. Deisenroth asserts that Dr. Clerk prescribed it. *See* Mot. 5 ("Dr. Clerk prescribed Wellbutrin for Deisenroth's depression."); *see also* AR 457 (indicating how many refills Deisenroth had left). The record also indicates that in April 2016, Dr. Clerk independently prescribed Pristiq. AR 66 (Deisenroth told the ALJ at the hearing that Dr. Clerk prescribed the Pristiq); AR 451(noting Deisenroth was to "[s]tart Pristi[q]"). In any event, if the ALJ wasn't clear on whether Dr. Clerk prescribed the medication for Deisenroth's depression, the ALJ should have sought clarification to fully develop the record. *See Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) ("In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.").

evidence" standard, the ALJ erred for the reasons discussed above. I would note, however, that Dr. Acenas' opinion that Deisenroth had "no mental functioning limitations" was based on the tests he administered during his one-time examination. That is not a "specific and legitimate" reason to discount Dr. Clerk's opinions on Deisenroth's limitations because – as the ALJ pointed out herself – Dr. Acenas did not consider the "residual effects of sleep apnea" on the claimant. AR 25. Dr. Clerk has treated Deisenroth for sleep apnea for years, and "[w]e generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5); *see Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014). As his treating physician, Dr. Clerk has extensive notes backing up his opinions on the residual effects of the sleep apnea on Deisenroth. The one-time examination of Dr. Acenas does not provide a specific and legitimate reason supported by substantial evidence to discount Dr. Clerk's opinions based on his long-term treatment history. *See Lester*, 81 F.3d at 830-31 (holding the ALJ must state "specific and legitimate reasons" supported by substantial evidence to reject the contradicted opinion of the treating physician).

For similar reasons, the Commissioner cannot rely on Dr. Bell, whose opinion was supposedly given great weight by the ALJ and who *found* Deisenroth to have marked limitations at least in "concentration, persistence, and pace," to contradict Dr. Clerk. Dr. Bell reviewed only Deisenroth's records and did not examine, much less have a long term treating relationship with, Deisenroth.

The Commissioner also defends the ALJ's dismissal of Dr. Clerk's opinions on the grounds that Deisenroth's sleep apnea cannot be disabling because Deisenroth continued working for many years after his initial diagnosis in 2002. The ALJ concluded that the fact that Deisenroth was diagnosed "years" before the alleged onset date, and nonetheless continued working, "supports the inference" that Deisenroth could work from 2015 on despite his sleep condition. AR 24. However, as noted above, the ALJ ignored evidence that in 2015 through 2017 Deisenroth's sleep quality was recurrently poor and his daytime sleepiness remained high. The ALJ also ignored Deisenroth's testimony from November 2017 that the sleep condition increasingly

impacted his functioning (causing his termination in 2015) and had gotten worse prior to his termination and in the years since. AR 43, 55. His treating physician's opinions – based on the longitude of the treatment relationship – could not be discounted just because Deisenroth worked following his sleep apnea diagnosis.

Relatedly, the Commissioner argues that an "obvious contradiction" further undermining Dr. Clerk's opinions is that in his Medical Source Statement, Dr. Clerk opined that Deisenroth was "unable to perform any work since 2002," yet he continued to work until 2015. Cross-Mot. 3. This argument is not persuasive since it is advanced by the Commissioner and was not mentioned by the ALJ. *Stout v. Comm'r of SSA*, 454 F.3d 1050, 1054 (The court is "constrained to review the reasons the ALJ asserts" and cannot "affirm the decision of an agency on a ground that the agency did not invoke in making its decision.") (internal citations omitted). Moreover, the Medical Source Statement asked Dr. Clerk "what is the date that all of the limitations identified in this questionnaire FIRST BEGAN." AR 431. Given that Dr. Clerk did not actually fill out the only section of the Statement that asked about "limitations," but did fill out information about Deisenroth's diagnoses and symptoms, and indicated how those symptoms impact on his attention, concentration, and ability to handle workplace stress, it is likely that Dr. Clerk was identifying when the conditions and symptoms started. AR 429-431. But if the ALJ had found some ambiguity with Dr. Clerk's statement, she could have followed up and clarified.

The ALJ erred in discounting Dr. Clerk's opinion because he has the credentials to diagnose and treat both Deisenroth's sleep condition and his major depression and assess the physical and mental limitations that flowed from those conditions. The ALJ failed to give reasons supported by substantial evidence for discounting Clerk's opinions regarding the limitations caused by Deisenroth's sleep apnea and depression.

### B.    KIT CHATSINCHAI

Deisenroth also argues that the ALJ impermissibly gave "little weight" to the opinions and detailed treatment notes from his therapist Kit Chatsinchai. *See, e.g.,* AR 434 (Deisenroth exhibited symptoms of depression, decreased energy, sleep disturbance, and problems interacting with the public and opinion that these symptoms would frequently interfere with attention and

concentration to preform simple work tasks).  The ALJ gave "little weight" to Chatsinchai's

opinions that Deisenroth would be unable to perform tasks requiring public contact, close-

interaction with co-workers and supervisors, or a fast past because a therapist is not an "acceptable

medical source" for "medical opinions" or diagnoses  While the ALJ and the Commissioner are

correct that only "[a]cceptable medical sources" can establish the existence of a medically

determinable impairment, 20 C.F.R. § 404.1513(a), "other sources" like Chatsinchai can be relied

on to show the severity of impairments and how they affect the individual's ability to function. 20

C.F.R. § 404.1513(d).

Of course, an ALJ may discount the opinion of an "other source" in favor of conflicting

testimony from additional sources, but only if the ALJ by gives "germane" reasons.  *Molina v.*

*Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).  Simply stating someone is not an acceptable medical

source is not a germane reason.

Chatsinchai's two medical source statements from August 2016 and November 2017

explain Chatsinchai's extensive treatment history with Deisenroth (monthly therapy treatment

from May 2015 through 2017). AR 426, 464.  They also explain, based on that treatment history,

Chatsinchai's opinions of the severity of Deisenroth's depression (which, as noted, was repeatedly

diagnosed by Dr. Clerk, an acceptable medical source) and how that depression impacts

Deisenroth's ability to function.  *See* 426-27, 464-67.  The ALJ disregarded all that evidence

because it was not consistent with the opinions of the examining physicians (Dr. Wagner and Dr.

Acenas) and the non-examining state consultants.  AR 26.  This was an error.

The ALJ failed to engage with the evidence and opinions that Chatsinchai was an

appropriate source for the severity of Deisenroth's impairment from his depression and how those

impairments limited Deisenroth's ability to function.  Further, the ALJ's reasons for discounting

Chatsinchai's opinions on severity and limitations was simply that they were "not consistent" with

the opinion of one-time examiners Wagner and Acenas and the non-examining state consultants,

yet failed to identify which tests (or opinions based on tests) conducted by Wagner or Acenas

*conflicted* with Chatsinchai's opinions based on his long-term treatment of Deisenroth.  The same

is true for the reviewing consultants.  That the examiners and consultants had different opinions

based on purported tests *not specifically identified* by the ALJ does not create "germane" reasons allowing her to discount the extensive evidence supporting Chatsinchai's opinions on the severity of and limitations imposed by Deisenroth's depression.

The Commissioner argues that the ALJ did not err in rejecting Chatsinchai's opinions because Chatsinchai only reported on Deisenroth's subjective complaints and had no objective "mental status examination findings" to support his opinions. Cross-Mot. 4. Only the Commissioner, not the ALJ, raises this argument. I need not address arguments about the medical record raised only by the Commissioner. *See Stout*, 454 F.3d at 1054. But it is worth saying that "[t]he Ninth Circuit has held that, given the nature of psychiatry, '[d]iagnoses will always depend in part on the patient's self-report,' and that 'the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness.'" *Bass v. Berryhill*, No. 18-cv-04365-WHO, 2019 WL 4751869 *31 (N.D. Cal. September 30, 2019) (citing *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017)). That Chatsinchai's therapy notes and opinions flowing therefrom are based on Deisenroth's self-reports is not a legitimate reason to reject Chatsinchai's opinions. And the Commissioner does not identify what "objective findings" a treating therapist would need to make in order to opine about how mental health problems limit an individual's functioning based on a long-term treating relationship.[4]

Finally, while an ALJ may discount a therapist's opinion for being inconsistent with a medical examiner's testimony, the "germane reasons" for discounting the therapist's opinions "in favor of the conflicting testimony" of an examiner must still be "substantiated by the record." *See Molina*, 674 F.3d at 1111. In *Molina*, the Ninth Circuit held that the ALJ provided several germane reasons for discounting a nurse practitioner's opinion: her opinion on Molina's mental impairments primarily came from a "check-in-the-box form" without support from clinical

---

[4] The Commissioner raises the argument several times that there were no tests done to support the "purported severity if Plaintiff's depression." Cross-Mot. 3-5, 7. Deisenroth had been diagnosed with depression by Dr. Clerk and treated for it by both Clerk and Chatsinchai. AR 268-69, 419-20. Additionally, both the consultative psychiatrist, Dr. Acenas, and medical expert, Dr. Bell, found that Deisenroth had depression. AR 48, 416-17. The diagnosis from the physicians is a sufficient a basis to show how Deisenroth's condition impacted him, even if Chatsinchai could not give an "opinion" that that the depression would make him too limited to work.

findings, "though she was instructed to do so," she provided several conclusory and conflicting assessments, and her opinion was inconsistent with the opinion of a specialist. *Id.* at 1111-12.

Here, unlike in *Molina*, Chatsinchai's opinions are very detailed (and accompanied by notes from the long-term therapy treatment), his opinions are fully consistent (not internally inconsistent, as in *Molina*), and – most significantly – his opinions on severity and limitations are fully consistent with Dr. Clerk's. AR 430, 434. Chatsinchai, who saw Deisenroth monthly, affirmed both the impairments (depression and the sleep condition) and severity of those impairments found by Deisenroth's treating physician, who was an acceptable medical source. That Chatsinchai's opinion was inconsistent with the one-time examiner's opinions was not a germane reason for the ALJ to discount it.

## II.    DEISENROTH'S TESTIMONY

Deisenroth argues that the ALJ also erred in finding Deisenroth's testimony about the severity of his conditions and significance of his limitations not credible because his testimony allegedly was inconsistent with unspecified "objective medical evidence," inconsistent with evidence that Deisenroth's sleep apnea improved with treatment, and inconsistent with the fact that Deisenroth was able to continue working after his 2002 sleep apnea diagnosis. AR 25, 27.

The ALJ must engage in a two-step analysis when evaluating a claimant's credibility. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, the ALJ determines "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal quotations omitted). Second, if the claimant has met the first step and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal quotations omitted); *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *Garrison*, 759 F.3d 995 at 1014–15. An ALJ must "specifically identify what testimony is credible and what testimony undermines claimant's complaints." *Morgan*, 169 F.3d at 599.

The ALJ may consider many factors when weighing credibility, including "reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and

unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotations omitted). An ALJ's assessment of a claimant's credibility and pain severity is entitled to great weight. *See Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989).

Here, the ALJ found that Deisenroth's medically determinable impairments could reasonably cause the symptoms he alleged in his testimony. AR 25. But she thought Deisenroth's statements regarding "the intensity, persistence and limiting effects of these symptoms" were not consistent with the medical evidence in the record. *Id*. Deisenroth points out that while the ALJ concluded that "objective medical evidence" discredited some of Deisenroth's testimony, the ALJ failed to identify what specific evidence discredited Deisenroth's self-reports regarding his limitations.

In the Ninth Circuit, an "ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective medical evidence,' without any 'specific findings in support' of that conclusion is insufficient." *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1103 (9th Cir. 2014). Here, the ALJ made a general statement that "[s]upport for the claimant's assertion is weakened by the extent to which his assertions of impairment-related symptoms are inconsistent with the other evidence in the record." AR 27. The ALJ also stated that the claimant had some limitations "but only to the extent described in the [RFC] above." *Id*. This is an insufficient basis for discrediting his testimony. *See Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017) (finding that the ALJ's statement that the claimant's testimony on his symptoms was not credible to the extent it was "inconsistent with the above residual functional capacity assessment" was an insufficient basis for discrediting the testimony).

With respect to Deisenroth's 2002 sleep apnea diagnosis and his continued work, the ALJ noted that Deisenroth continued to work from 2007 to 2015 despite his severe sleep apnea. She relied on *some* of Dr. Clerk's notes that showed that the claimant's sleep quality was "good" or "significantly better." AR 25. But the ALJ never identified which pieces of evidence she was using to discount Deisenroth's testimony, nor did she explain why he reasonably would not suffer the alleged symptoms from the residual effects of his condition. *See id.*; *Treichler*, 775 F.3d at

1103 (holding the ALJ must specify "what evidence undermines the claimant's complaints" and "explain[] which evidence contradicted the testimony").

Deisenroth points out that even though he continued working after his diagnosis of sleep apnea from 2002 until 2015, he consistently testified that the impacts of his ongoing sleep apnea and depression worsened prior to 2015 (causing the forgetfulness and slowed pace that he believes led to his being fired from work). AR 55. He also points to evidence in the record, that the ALJ did not address, supporting his testimony that the impacts from the continued sleep apnea were worsening and his sleep quality was not improving. For instance, while the ALJ noted that in November 2014 Dr. Clerk reported Deisenroth's sleep apnea was "controlled," during the same visit he reported "fatigue and decreased energy." AR 25; *Compare* AR 25 (the ALJ cited records from May 2016 that "claimant's sleep apnea was controlled… and his sleep quality was described as 'good,'" and in September 2016, "claimant's sleep apnea was described a[s] 'significantly better'… with good control of residual sleepiness during the day") *with* AR 452 (showing that in May 2016 Dr. Clerk reported that Deisenroth still experienced fatigued despite "excellent" treatment compliance); AR 456 (indicating in September 2016 that Deisenroth's sleep quality was "average" and he had to "take[] daily naps.").

Finally, there is detailed evidence in the record, primarily from Chatsinchai, that the combination of Deisenroth's consistent sleep quality issues and his ongoing depression were "reinforcing," and resulted in worse sleep quality and more depression, despite Deisenroth's consistent treatment from Dr. Clerk and Chatsinchai. AR 426.

By focusing on certain elements of Dr. Clerk's notes and ignoring others, the ALJ did not adequately consider Deisenroth's testimony that the effects of his sleep apnea and depression worsened over time, which was supported by evidence in the record. The ALJ failed to connect specific, clear and convincing reasons to show Deisenroth's testimony about the severity of his symptoms were inconsistent with the record.[5]

---

[5] Deisenroth also argues that the ALJ erred in dismissing his wife's lay-opinion testimony on the grounds that the limitations she testified to were contradicted by the examiners and state consultants. However, considering the multiple errors identified above, I need not reach this argument.

### III. STEP FIVE ANALYSIS AND REMEDY

A claimant's residual functional capacity is the most he can still do despite limitations. 20 C.F.R. § 416.945(a)(1). When assessing a claimant's RFC, the ALJ must consider all medically determinable impairments, including those that are not severe. § 416.945(a)(2).

Deisenroth argues that the ALJ failed at step five to include all his limitations in the hypothetical to the vocational expert to determine whether there were jobs in the national economy that Deisenroth could perform. Specifically, he contends that because the ALJ failed to include the restrictions in "concentration, persistence, and pace" that were assessed by Dr. Clerk, Chatsinchai, and Dr. Bell, the VE's testimony has no evidentiary value. Mot. at 15. As noted above, I have concluded that the ALJ improperly discounted the opinions and limitations described by Dr. Clerk and Chatsinchai and improperly discredited Deisenroth's own testimony. The ALJ's hypothetical was not accurate. *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (questions posed to the VE must set out all limitations and restrictions of the claimant).

The more significant question, however, is whether I should "credit as true" the opinions and limitations assessed by Dr. Clerk and Chatsinchai. If so, given the VE's testimony that there would not be work for a hypothetical individual who had both the limitations found by the ALJ and the limitation supported by Clerk, Chatsinchai, and Deisenroth (where an individual was off task for about "20 percent of an eight hour day, or 40 hour work week"), I must decide whether to remand for payment of benefits. AR 78.

The Ninth Circuit has developed a three-part credit-as-true standard. *Garrison*, 759 F.3d 995 at 1020. Each part "must be satisfied" to remand to an ALJ to calculate and award benefits: (1) "the record has been fully developed and further administrative proceedings would serve no useful purpose;" (2) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion;" and (3) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.*

The Commissioner argues against the propriety of the Ninth Circuit's credit as true standard, reiterating the argument that the ALJ did not improperly reject the opinions of Dr. Clerk

1    and Deisenroth's own testimony, making the ALJ's evaluation consistent with the applicable legal

2    standards and free of reversible legal error. To the contrary, this is a rare case where all three

3    prongs of the credit-as-true analysis have been satisfied and remand for payment of benefits is

4    appropriate.

5              First, the medical record is fully developed. There are several medical reports from Dr.

6    Clerk, Chatsinchai's treatment notes that support Dr. Clerk's records, and Deisenroth's testimony

7    before the ALJ. The *only* contradicting evidence in record came from the state agency consultants

8    and one-time examining physicians (Dr. Wagner and Dr. Acenas); even the ALJ indicated that

9    these opinions did not consider the residual effects of sleep apnea. AR 25-27. Additionally,the

10   VE testified directly that a person with Deisenroth's alleged limitation of being "frequently"

11   distracted would be unable to do any work. The Commissioner does not identify and evidence

12   that would need to be developed on remand. In light of the record, I conclude that additional

13   evidence would not serve a "useful purpose." *See id.* at 1022.

14             Second, as I have already explained, the ALJ failed to provide legally sufficient reasons to

15   reject Deisenroth's testimony and the opinions of his treating physician and therapist. I need not

16   repeat that analysis here.

17             Third, if the improperly discredited evidence were credited as true, the ALJ would be

18   required to find Deisenroth disabled on remand. This conclusion follows from the VE's testimony

19   that a person with the impairments described by Deisenroth, Dr. Clerk, and Chatsinchai could not

20   work. *See Garrison*, 759 F.3d 995, 1022 (finding the third part was satisfied given the ALJ's

21   errors, the strength of the "improperly discredited evidence" and "a VE explicitly testified that a

22   person with the impairments described by [claimant] or her medical caretakers could not work.").

23             Having concluded that Deisenroth satisfies all three parts of the credit-as-true-analysis and

24   after considering the ALJ and Commissioner's arguments, independently reviewing the record,

25   and finding nothing that would create doubt that Deisenroth is disabled, I find that a remand for a

26   calculation and award of benefits is required.

27                                          **CONCLUSION**

28             In light of the errors identified above, I GRANT Deisenroth's motion for summary

                                                   27

judgment, DENY defendant's cross-motion for summary judgment, and REMAND the case for a calculation and award of benefits.

     **IT IS SO ORDERED.**

Dated: March 26, 2020



William H. Orrick
United States District Judge